# United States Court of Appeals
## For the First Circuit

No. 03-2433

UNITED STATES OF AMERICA,

Appellee,

v.

DALE MCLEAN,

Defendant, Appellant.

No. 03-2600

UNITED STATES OF AMERICA,

Appellee,

v.

MANOLIN FELIZ TERRERO,

Defendant, Appellant.

No. 03-2646

UNITED STATES OF AMERICA,

Appellee,

v.

MAURICIO BERGUETTE-MERAN, a/k/a Manuel Enrique Heyliger Cruz,

Defendant, Appellant.

No. 04-1110

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN ANTONIO NAVARRO,

Defendant, Appellant.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

———————————

Before

Boudin, Chief Judge,

Torruella, and Howard, Circuit Judges.

———————————

Edward S. MacColl, with whom Thompson, Bull, Furey, Bass & MacColl, LLC, P.A. was on brief, for appellant Dale McLean.
Henry W. Griffin was on brief, for appellant Manolin Feliz Terrero.
Robert Ruffner, with whom Vincent Kantz & Ruffner was on brief, for appellant Mauricio Berguette-Meran.
William Maselli was on brief, for appellant Juan Antonio Navarro.
Margaret D. McGaughey, Appellate Chief, with whom Paul D. Silsby, United States Attorney was on brief, for appellee.

———————————

June 9, 2005

———————————

**HOWARD**, <u>**Circuit Judge**</u>.  These consolidated appeals arise from a drug trafficking conspiracy in Maine in which all the appellants pleaded guilty or were convicted at trial of conspiracy to distribute crack cocaine.  Appellants Dale McLean, Manolin Feliz-Terrero, Juan Navarro and Mauricio Berguette-Meran all challenge their sentences.[1]  Navarro also challenges the partial denial of his motion to suppress.

**I.**

We present a brief overview of the facts, reserving a more detailed discussion for our analysis.

**A.**     <u>**The Conspiracy**</u>

From early summer of 2002 until a November 19, 2002 law enforcement raid, the appellants and a host of other individuals participated in a crack distribution conspiracy in Sabbattus, Maine.  Jorge Mattos of Springfield, Massachusetts, led the operation, along with his lieutenant, Janci Feliz.  Through an intermediary named James Birkbeck, Mattos arranged to rent a room in a trailer belonging to McLean and Debra Schrock in Sabbattus.  Mattos agreed to pay McLean, Schrock, and Birkbeck with cash or drugs.  The conspiracy operated as follows.

Mattos would send two individuals to the McLean trailer to sell prepackaged crack.  The sellers would stay for

---

[1]Appellant Jorge Marques dismissed his appeal shortly after this case was argued.

approximately one to two weeks.  At the end of the period, they would be relieved by a new two-person team, which would also serve a one or two-week shift and then be relieved.  Appellants Feliz and Berguette comprised one such team.

The trailer had two bedrooms, each with an adjoining bathroom.  McLean and Schrock shared what we will label the left bedroom; the drug-selling teams sent by Mattos stayed in the right bedroom.  The teams retained control of the drugs and the drug proceeds, which they typically hid outside the trailer.  Generally, Birkbeck, McLean or Schrock would deal with the drug purchasers and collect the purchase price.  They would take the money to a team member in the right bedroom or adjoining bathroom and exchange the cash (or acceptable electronic merchandise such as game systems and televisions) for crack.  Birkbeck, McLean, or Schrock would then deliver the crack to the purchaser, keeping an agreed upon portion of crack or cash for himself or herself.  Birkbeck, McLean, and Schrock regularly smoked crack during the relevant period, and McLean ran up a drug debt beyond his agreed remuneration.  By late in the conspiracy, McLean became largely incapacitated due to heavy crack usage and spent most of his time in the left bedroom.

Mattos used Navarro, his nephew, as his link with the conspirators in Maine.  As Mattos' representative, Navarro managed the assets of the conspiracy, controlled the local participants, and resupplied the drug-selling teams.  Upon being notified by the

team that the crack supply was running low, Navarro would go to Maine with additional supply and take the sales proceeds back to Mattos. Navarro also managed the communications between the other participants, serving as a translator between the drug-selling teams (whose members were Dominican and spoke Spanish) and Birkbeck, McLean and Schrock (who spoke English). In addition, Navarro directed Birkbeck, McLean and Schrock, instructing Schrock to keep the operation "safe" and to handle the customers (so that the drug-selling teams could remain hidden), and McLean to serve in Birkbeck's stead after Birkbeck's arrest. Significantly, Navarro also served as enforcer, once tracking down an individual who stole drugs and cash from the operation, and threatening Schrock with death if she ever "ratted" out the conspirators. Navarro also threatened (once at gunpoint) to kill McLean's daughter, Crystal McLean, when McLean resisted Navarro's directive that he replace Birkbeck, and when McLean failed to pay off his mounting drug debt.

In early November, Marques, Crystal McLean's fiancé, came to live at the trailer in response to the threats against her. He agreed to participate in the conspiracy by helping to service McLean's customers until McLean's debt to Navarro was paid. During this period, either Marques or Crystal was required to remain at the trailer at all times, as security for McLean's debt. Marques' arrival in November changed the living arrangements in the trailer. While the narcotics transactions still took place in the right

bedroom and adjoining bathroom, the drug-selling teams no longer slept there. Instead, they permitted Marques and Crystal to use the right bedroom (beginning a few days before the raid), while the teams slept in the living room.

A cooperating individual ("CI") began making purchases from the trailer in October. These purchases and related phone calls were monitored by law enforcement. During an October 28, 2002 purchase, McLean told the CI that the members of the drug-selling team were interested in acquiring 9 mm handguns, and that McLean himself was interested in the CI's .357 magnum revolver. At a November 4, 2002 purchase, McLean again asked the CI about the 9 mm pistols in which the drug-selling team had expressed an interest.

Law enforcement agents raided the trailer on November 19, 2002. They arrested Marques, Crystal, and Feliz in the right bedroom, McLean in the left bedroom, and Berguette outside the trailer. In the right bedroom, the agents found 5 rocks of crack, a .22 caliber handgun, and $1820 in cash. An additional $7900 in cash was found in a crawl space under the trailer.

## B.    District Court Proceedings

McLean, Feliz and Berguette each pleaded guilty to conspiring to distribute 50 or more grams of cocaine base and agreed to cooperate with the government. Marques pleaded guilty to conspiring to distribute 5 or more grams of cocaine base and also

agreed to cooperate.[2] McLean was sentenced first, and Marques, Feliz and Berguette were sentenced shortly thereafter in a consolidated proceeding. All received two-level increases for possession of a firearm under U.S.S.G. § 2D1.1(b)(1), and all were denied the benefit of safety valve provisions, set forth at 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, because of the presence of the .22 caliber handgun. See 18 U.S.C. § 3553(f)(2)(safety valve unavailable if defendant "possess[es] a firearm"); U.S.S.G. § 5C1.2(a)(2)(same). All were the beneficiaries of government motions for downward departures for substantial assistance. The sentencing ranges and net sentences after the downward departures were as follows: Berguette, a range of 135-168 months, and an actual sentence of 95 months; Feliz, a range of 168-210 months, and an actual sentence of 118 months; Marques, a range of 46-57 months, and an actual sentence of 24 months; and McLean, a range of 108-135 months, and an actual sentence of 44 months.

Navarro went to trial after the district court denied, in part, his motion to suppress certain statements that he made after his arrest. At trial, McLean, Schrock, Marques, Birkbeck, Berguette, Feliz, and Crystal McLean testified against him. The government introduced post-arrest statements made by Navarro that he had been a driver and translator for the conspiracy, and his

---

[2]Schrock and Birkbeck also pleaded guilty. Crystal McLean was not charged.

statement in which he identified the conspiracy's "boss." The jury found him guilty of conspiring to distribute 50 grams or more of crack cocaine. The district court found Navarro's guideline range to be 262 to 327 months and sentenced him to 300 months' imprisonment. These appeals followed.

## II.

Navarro challenges the partial denial of his motion to suppress his post-arrest statements. Navarro also challenges a sentencing enhancement for his role as a manager or supervisor in the conspiracy. McLean, Feliz, and Berguette raise a common issue: whether the district court erroneously denied them the benefits of the "safety valve" provision because they possessed a firearm during the course of the conspiracy. Navarro and Berguette also seek to raise issues based upon Blakely v. Washington, 124 S. Ct. 2531 (2004).

### A.    **Motion to Suppress**

Navarro argues that the district court erred in failing to suppress certain of his post-arrest statements. The relevant facts are as follows.

Navarro was arrested after the other appellants when he, along with Mattos and another conspirator, attended Feliz's detention hearing. Navarro and his companions were identified to law enforcement officers by Crystal McLean, who was present in the courthouse. As he was led off to be booked, Navarro became

hysterical and made unprompted statements about his role as driver and translator, and about Mattos.  He also offered to cooperate to avoid going to jail.  While being booked by Marshal Folan and DEA Agent Rousseau, Navarro continued his outbursts and referred to an individual named "Tommy."  Rousseau asked Navarro "Who is Tommy?"  Navarro identified "Tommy" as Janci Feliz. He also volunteered that Mattos owned a restaurant called "El Creoleo" in Springfield, and that Mattos worked for a Latin King street gang member in New York named "Tommy."  Navarro was not read his <u>Miranda</u> rights during the booking procedure.

Navarro moved to suppress his post-arrest statements and was granted a hearing at which Folan, Rousseau and Navarro testified.  Navarro claimed on direct examination that the officers, in particular Rousseau, were anxious to get him alone and interrogate him from the beginning.  But on cross examination, he conceded that he was sobbing in the booking room and offered certain information in an effort to get released.

The magistrate judge who conducted the hearing concluded that everything said prior to the "Tommy" question was voluntarily offered by Navarro in an attempt to secure his release.  But he also concluded that the "Who's Tommy?" question violated <u>Miranda</u> because it was reasonably likely to elicit incriminating information.  He thus recommended that the answer to the "Tommy" question and the statements that followed -- that Janci was

"Tommy," that Mattos owned a Springfield restaurant called "El Creoleo," and that Mattos worked for a Latin King called "Tommy" -- be excluded. The trial judge accepted the recommendation in its entirety. Navarro argues that all of his statements should have been suppressed as obtained in violation of Miranda.

"We review a district court's findings of fact with respect to a suppression motion for clear error." United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). Our review of the district court's ultimate application of Miranda is de novo. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000).

If the defendant is not advised of his Miranda rights and has not validly waived them, "the police are prohibited from interrogating him and any statements obtained in violation of this rule will be excluded from evidence at trial . . . ." Reyes, 225 F.3d at 76 (internal citation omitted). But there are two exceptions to the Miranda doctrine which are relevant here. First, there is a booking exception, which allows police officers to ask general background questions (name, date of birth, etc.) while processing a newly arrested individual without advising him of his Miranda rights. Id. at 76-77. Second, "any statement made freely and voluntarily without any compelling influences is, of course, admissible in evidence." Lopez, 380 F.3d at 545 (internal quotation and citation omitted).

In our view, the district court correctly concluded that these <u>Miranda</u> exceptions apply to Navarro's statements prior to being asked "Who's Tommy?" The only questions that the officers asked before this question were booking questions, and the additional information that Navarro provided before the "Tommy" question was thus volunteered. And, as we have set forth above, the district court excluded all the statements made in response to the one non-booking question. The admission of Navarro's other statements did not violate <u>Miranda</u>.[3]

## B.      Role in Offense Enhancement

Navarro argues that the evidence was insufficient to show that he held a managerial or supervisory position in the conspiracy.[4]  He asserts that the testimony of the Massachusetts conspirators shows that he was an ordinary participant and that Mattos and Janci Feliz were the only leaders. He also asserts that the Maine conspirators' testimony regarding his threats was not credible.

---

[3]In so ruling, we reject Navarro's entreaty that we disbelieve the officers' testimony as to what happened. The district court accepted the officer's testimony and our review of the record persuades us that the court's credibility determinations were not clearly erroneous.

[4]The relevant section of the guidelines provides that a defendant's offense level be increased by three levels based upon his role as a manager or supervisor in the criminal conduct if the criminal conduct involved five or more participants or was otherwise extensive. <u>See</u> U.S.S.G. § 3B1.1(b).  There is no dispute that there were five or more participants in the conspiracy.

The district court concluded that a three-level enhancement was appropriate because Navarro acted as a manager in the conspiracy by controlling its assets and directing at least one other participant. We review the district court's application of an enhancement based upon the defendant's role in the offense for clear error. See United States v. May, 343 F.3d 1, 7 (1st Cir. 2003.

Navarro's claim that Mattos and Janci Feliz were the true leaders is a nonstarter. That Mattos and Janci were higher up the chain at the conspiracy's Massachusetts "headquarters" says nothing about whether Navarro acted as a "local" supervisor of the Maine conspirators, as the district court found. Navarro concedes that the Maine conspirators regarded him as a supervisor, and the evidence overwhelmingly establishes that he supervised them.

Navarro's claim that the Maine conspirators' testimony regarding his threats was not credible also goes nowhere. The district court was able to observe the witnesses and assess their credibility far better than this court can from a cold record. See generally United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). Moreover, as we have said, the evidence shows that Navarro managed the conspiracy's assets and directed the Maine conspirators in their duties. This evidence itself is more than enough to justify the enhancement.

## C.    **Application of the Safety Valve**

McLean, Feliz, and Berguette do not contest the propriety of the two-level enhancement that they received under U.S.S.G. § 2D1.1(b)(1),[5] but they challenge the district court's conclusion that they were ineligible for the safety valve. The court found, insofar as is relevant,[6] that the safety valve was unavailable because, in the court's view, each of the three conspirators possessed the .22 caliber handgun during the course of the conspiracy. Appellants contend that only proof of "actual possession" is sufficient to foreclose the application of the safety valve, and that even if constructive possession is sufficient (as the court found), there was inadequate evidence to establish such possession.

As suggested above, the "safety valve" provision allows a defendant to avoid the imposition of a mandatory minimum sentence so long as the defendant and the offense meet certain enumerated

---

[5]Section 2D1.1(b)(1) provides for a two level increase in the offense level "[i]f a dangerous weapon (including a firearm) is possessed . . . ."

[6]Shortly before the sentencing proceedings in this case, we held that a co-conspirator's possession of a firearm will not foreclose the application of the safety valve in favor of another co-conspirator who did not possess the firearm. See United States v. Figueroa-Encarnacion, 343 F.3d 23, 34-5 (1st Cir. 2003). The district court partially based its decision to deny McLean the safety valve on a theory of co-conspirator liability foreclosed by Figueroa-Encarnacion, but alternatively on the ground of McLean's constructive possession of the firearm. We focus on the court's alternative holding for present purposes.

-12-

criteria.  <u>See</u> 18 U.S.C. § 3553(f).[7]  The safety valve is

---

[7]The statute provides:

(f) Limitation on applicability of statutory minimums in certain cases.–Notwithstanding any other provisions of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded an opportunity to make a recommendation, that --

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
(3) the offense did not result in death or serious bodily injury to any person;
(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.  18 U.S.C. §3553(f).

-13-

reproduced, essentially verbatim, in the guidelines, see U.S.S.G. § 5C1.2, which, if applicable, can garner the defendant a two-level reduction in offense level, see U.S.S.G. § 2D1.1(b)(6). But as we have stated, the safety valve is unavailable to a defendant who "possess[es] a firearm . . . in connection with the offense." See 18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(a)(2).[8]

The question therefore arises: What constitutes "possession" of a firearm within the meaning of the statute and the guideline? Appellants contend that only "actual" possession[9] of a gun will suffice; the government responds that "constructive" possession is enough. We think that the government has the better argument.

Adoption of the appellants' position would be inconsistent with our normal interpretation of the word "possession" in the guidelines. See United States v. McDonald, 121 F.3d 7, 10 (1st Cir. 1997) (for purposes of U.S.S.G. § 2D1.1(b)(1), "any possession – actual or constructive – can trigger the two-level increase.") Further, our cases have generally held that

---

[8]As the government concedes, the fact that McLean, Feliz, and Berguette all received downward departures based on their cooperation which took them below the statutory minimum does not render this challenge moot. See generally United States v. Emery, 991 F.2d 907, 910 (1st Cir. 1993). The government also concedes that these appellants were otherwise eligible for the safety valve.

[9] Actual possession is generally defined as "the state of immediate, hands-on physical possession." See United States v. Zavala Maldonado, 23 F.3d 4, 6 (1st Cir. 1994).

either actual or constructive possession suffices in the context of firearms, explosives, and narcotics offenses. See, e.g., United States v. Liranzo, 385 F.3d 66, 69 n. 2 (1st Cir. 2004) (18 U.S.C. § 922(g)(1)); United States v. Carlos Cruz, 352 F.3d 499, 510 (1st Cir. 2003)(18 U.S.C. §924); United States v. Lopez-Lopez, 282 F.3d 1, 19 (1st Cir. 2002)(21 U.S.C. §841(a)(1)); United States v. Van Horn, 277 F.3d 48, 54-55 (1st Cir. 2002)(18 U.S.C. § 842(i)(1)); United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002)(18 U.S.C. § 922(g)(1)). Application of this same rule in this context makes abundant sense, as a defendant who, for example, has a concealed weapon strategically placed in a room where he conducts his drug business is no less dangerous than a defendant who conducts his business with a weapon on his person. We therefore hold that a defendant who has constructively possessed a firearm in connection with a drug trafficking offense is ineligible for the safety valve provisions set forth at 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.

We turn now to whether there was sufficient evidence of constructive possession. This circuit has consistently defined constructive possession as follows: "Constructive possession exists when a person knowingly has the power and intention at a given time to exercise dominion and control over an object either directly or through others." Carlos Cruz, 352 F.3d at 510; see also United States v. Nieves-Burgos, 62 F.3d 431, 437-38 (1st Cir. 1995); United States v. Torres-Maldonado, 14 F.3d 95, 102 (1st Cir.

-15-

1994); United States v. Garcia, 983 F.2d 1160, 1164 (1st Cir. 1993). As is true of actual possession, constructive possession does not require actual ownership of the weapon, see Liranzo, 385 F.3d at 69, and can be sole or joint, see Van Horn, 277 F.3d at 54-55.

Moreover, the requisite knowledge and intention can be inferred from circumstances, such as a defendant's control over the area where the contraband is found (e.g., defendant's home or automobile). See Zavala Maldonado, 23 F.3d at 7-8. But knowledge must be fairly inferable from the circumstances. See id. at 7; United States v. Booth, 111 F.3d 1, 2 (1st Cir. 1997)(knowing possession required); see also United States v. Weems, 322 F.3d 18, 24 (1st Cir. 2003)(mere proximity to a firearm is not enough to establish actual or constructive possession); Garcia, 983 F.2d at 1164 ("Mere presence or association with another who possessed the contraband is, however, insufficient to establish constructive possession.") Thus, "[t]here must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." In re Sealed Case, 105 F.3d 1460, 1463 (D.C. 1997).

We turn now to each appellant's claim that the district court erred in concluding that he constructively possessed the firearm. McLean and Berguette primarily argue that the evidence is insufficient to ground a finding that they knew of the firearm's

existence. Feliz concedes that he had knowledge of the firearm, but challenges the sufficiency of the evidence to ground a finding that he had the intention and power to exercise dominion and control over the weapon.

In reviewing a district court's determination that a defendant failed to qualify for the safety valve, the standard of review varies depending upon whether the determination is based on conclusions of law or differential fact-finding. United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003). If the former, our review is plenary; if the latter, we review only for clear error. Id. Critical to our determination is the evidence that the district judge considered as to each appellant. Appellants bear the burden of showing their entitlement to a safety valve reduction. See United States v. Richardson, 225 F.3d 46, 53 (1st Cir. 2000).

The evidence concerning the .22 caliber handgun came from three primary sources: Marques' testimony at Navarro's trial; Agent LaChance's testimony at the consolidated sentencing hearing for Marques, Feliz, and Berguette; and Feliz's testimony at both Navarro's trial and the consolidated sentencing hearing.

Marques testified that McLean's brother traded the unloaded gun for crack about two days before the raid. He further testified that McLean and Feliz were present during the transaction, and that he and McLean physically handled the gun. He recounted that, after the exchange, he placed the gun in the closet

-17-

of the right bedroom.  At Navarro's trial, Feliz testified that he had only been shown the gun the night of the raid by Marques, that it was unloaded, that Marques put it in his bedroom closet, and that he did not know who owned it.

Agent LaChance testified that the unloaded .22 caliber pistol was found in the right bedroom in a small closet on the left side of the room.  He further testified that a picture of Crystal McLean and two suitcases belonging to Berguette and Feliz were also found in the closet.  On cross-examination, LaChance clarified that the gun was not in plain view, and he conceded that at least Feliz's suitcase was actually found in the living room.  At the sentencing hearing, Feliz admitted that Marques had shown him the gun and that he knew where it was stored, but emphasized that he and Berguette were staying in the living room rather than the right bedroom in the days before the raid.  He also testified that, at the time of the raid, his suitcase was in the living room in anticipation of his imminent departure for Springfield.

1. McLean's Arguments

McLean primarily contends that the district court's decision cannot stand because McLean had no knowledge of the firearm.  The government responds that the evidence supports the ruling because the gun was seized from the trailer McLean owned, the trailer was the focus of the drug operation, McLean and four co-conspirators were arrested there, McLean knew his co-

-18-

conspirators wanted to acquire guns, and McLean knew that some of his co-conspirators were armed because they had threatened his daughter at gunpoint.[10]

In our view, the record reveals insufficient grounds for concluding that McLean had knowledge of the .22 caliber pistol.[11] He did not stay in the room where the weapon was found. Instead, at this point in the conspiracy, McLean spent most of his time in his room. Moreover, because the pistol was not acquired until a few days before the raid, it could not have been the weapon used to threaten Crystal McLean in October. Finally, that McLean was aware that his co-conspirators were interested in 9 mm pistols is not sufficient evidence that McLean knew that his co-conspirators had actually acquired a .22 caliber pistol. In sum, we think the inference of knowledge too tenuous to stand.[12]

---

[10]McLean's presentence report ("PSR") recounted how the .22 caliber handgun had been found, how McLean had tried to obtain guns for the drug-selling team members and himself from the CI, and that Navarro had threatened Crystal at gunpoint.

[11]We recognize that Marques' testimony at Navarro's trial tended to establish that McLean knew about and physically possessed the firearm. However, there is no indication in the record that the sentencing judge, who also presided over the Navarro trial, considered or relied on this evidence in any manner in sentencing McLean. The government did not make this evidence part of McLean's sentencing record and did not argue it in any fashion below or on appeal; thus defense counsel had no opportunity to challenge it. Therefore, we will not consider this evidence in reviewing McLean's instant appeal.

[12]Moreover, even if McLean had knowledge of the gun, we question whether there is a basis in the record for finding that he had the power to exercise dominion and control over it. We have

<u>        </u>2.  <u>Berguette's Arguments</u>

Berguette, like McLean, contends he did not have constructive possession of the .22 caliber handgun because he was unaware that the firearm existed.  The government argues that such knowledge can be inferred because Berguette stayed in the room in which the gun was found, his suitcase was found in the closet with the gun, and (as recounted in the PSR) Birkbeck stated that the Berguette had acquired the gun for himself.

As with McLean, there is inadequate evidence to infer that Berguette had actual knowledge of the gun.[13]  That the drug-

_____

noted that, when McLean balked at taking Birkbeck's place, Navarro threatened his daughter at gunpoint.  Moreover, both his daughter and future son-in-law were held as <u>de facto</u> prisoners for McLean's drug debt.  Significantly, the district court specifically found that McLean was not in control of the drugs or proceeds located in the same bedroom of the trailer as the gun.  These undisputed facts, coupled with McLean's increased drug use and withdrawal into his room late in the conspiracy, strongly support a conclusion that McLean did not exercise dominion and control over his co-conspirators or their property.

[13]As to knowledge, only Birkbeck's statement in the PSR ties Berguette directly to the firearm.  But Berguette challenged the admissibility of the Birkbeck statement, asserting that the government never provided the relevant notes to counsel and that the government represented that it would not rely on the Birkbeck statement at sentencing.  Berguette's counsel renewed this contention on appeal.  So far as the record discloses, this issue was not expressly resolved in the district court.  However, a fair reading of the sentencing transcript reveals that the Birkbeck statement was not considered.  First, the only statements referred to at sentencing were those of LaChance, Marques, and Feliz; it is unlikely that Birkbeck's highly incriminating statement would have been forgotten by both sides.  Second, the government only argued constructive possession at sentencing, even though Birkbeck's statement, if credited, demonstrates actual possession.

selling teams sought 9 mm pistols does not by itself mean Berguette knew about this .22 caliber pistol. Further, Berguette did not live in the right bedroom during the period the that gun was in the trailer, and Agent LaChance's testimony was less than definitive as to the location of Berguette's suitcase. The most relevant circumstance is that Berguette participated in drug transactions in the right bedroom while the handgun was in the closet. But without more, this is not enough to show knowledge of the hidden gun. As we have said, mere proximity to a firearm is inadequate to establish constructive possession. See Weems, 322 F.3d at 24. This is true even if the defendant is near the gun in a room devoted to narcotics activity. See Torres-Maldonado, 14 F.3d at 103 (insufficient evidence to support conviction under 18 U.S.C. § 924(c) where there was no evidence that defendant had knowledge of gun hidden in tote bag on couch where defendant was sitting); United States v. Pena-Sarabia, 297 F.3d 983, 985 & 989 (10th Cir. 2002)(wife did not possess co-conspirator husband's gun, which he kept under the couple's bed with cocaine supply, because she had no knowledge that the gun existed).

### 3.  Feliz's Arguments

Like McLean and Berguette, Feliz argues that the record fails to establish that he had constructive possession of the firearm. But unlike McLean and Berguette, Feliz concedes that he had knowledge of the gun, and focuses on whether there was

sufficient evidence to find that he met the other elements of constructive possession. The government responds that Feliz's knowledge of the weapon, his role in the conspiracy, and the circumstances of his arrest provide ample evidence to ground the district court's finding.

It is undisputed that Feliz knew about the gun, knew where it was hidden, engaged in drug sales in the right bedroom in close proximity to the hidden weapon, and was arrested in the right bedroom with crack and drug proceeds around him. As knowledge is uncontested, the issue is whether the record establishes that Feliz had the power and intention to exert dominion and control over the firearm.

The power component is fairly straightforward. Feliz was close enough to the firearm to pick it up at any time. This is enough. See Van Horn, 277 F.3d at 55 (power element established because defendant could reach into adjacent bucket and take physical possession of the explosives). That Marques was next to him and capable of doing the same is irrelevant, as possession can be joint. See id. at 56 ("Exclusive access is not a prerequisite to possession . . . .")

There is also a sufficient basis for inferring intent. As a practical matter, Feliz could well have intended to use the gun for protection in the event of trouble with one of the crack sales. Cf. Carlos-Cruz, 352 F.3d at 510 (defendants "had power and

-22-

intention to retrieve the firearms if and when the upcoming drug transactions turned sour"). Further, the gun was among the proceeds of the drug sales, which Feliz was obliged to protect for Navarro. Cf. Zavala Maldonado, 23 F.3d at 8 (intent to store and transfer narcotics to confederate). In sum, Feliz's proximity to the weapon, coupled with his knowledge of the weapon and role in the conspiracy, is more than sufficient to establish constructive possession. Cf. Nieves-Burgos, 62 F.3d at 438 (evidence of possession sufficient for conviction under 18 U.S.C. §924(c) where active participant in drug conspiracy arrested in hotel room with cash, narcotics, and firearm in tote bag two feet from where he sat).

## D. **Booker Claims**

Appellants Berguette and Navarro filed supplemental briefs before this case was argued challenging their sentences on Blakely grounds. Subsequent to argument, the Supreme Court issued its decision in United States v. Booker, 125 S. Ct. 738 (2005), and this court issued its decision in United States v. Antonakopoulos, 399 F.3d 68 (1st Cir. 2005). As a consequence, we ordered further supplemental briefing.

Berguette argues that any Booker error should be deemed preserved because he sought a downward departure from the guidelines sentence, Booker error should be deemed a structural error for which prejudice should be presumed, and there was a

reasonable probability that he would receive a lower sentence on remand. As we have already determined that Berguette's sentence must be vacated and remanded, we need not address his claims.

Navarro argues that he preserved any Booker error, in effect, by arguing in the district court that the evidence was inadequate to support an enhancement for Navarro's role in the offense. Alternatively, Navarro argues that the plain error standard is met because there is a reasonable probability that Navarro would receive a lower sentence on remand. In particular, Navarro argues that the district judge would be free under the new regime to give more weight to such factors as Navarro's youth, his prospects for rehabilitation, his lack of guidance, the malignant influence of his uncle, his responsibilities to his children, and the much lower sentences received by the other co-conspirators.

A claim of Booker error is preserved "if the defendant below argued Apprendi or Blakely error or that the Guidelines were unconstitutional." Antonakopoulos, 399 F.3d at 76. Navarro raised no such argument below. Thus, Navarro's only hope is to establish plain error.

To make such a showing, a defendant must demonstrate (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously impairs the fairness, integrity, or public reputation of judicial proceedings. Id. at 77. The first two prongs are met if the district court treated the Sentencing

Guidelines as mandatory during sentencing.  Id.  As to the third prong, the defendant must show a "reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime." Id. at 75.  The reasonable probability standard "is not met by the mere assertion that the court might have given the defendant a more favorable sentence." Id. at 80.  One category of claims that might warrant remand on plain error review is the one involving arguments that a mitigating factor existed but was not available for consideration under the "mandatory" Guidelines.  Id. at 81. Navarro attempts to locate his argument within this category, but we are not persuaded.

First, Navarro actually made the mitigating arguments that he now posits before the district court.  He does not elaborate how he could make them more convincingly on remand. Second, nothing in the transcript indicates that the court was in any way moved by these arguments.  We note that Navarro was sentenced in the middle of the guideline range, rather than at the bottom, and so the district court could have given him a lower sentence under the old regime.  That it did not do so speaks volumes.  Also, the court stated that it believed the sentence to be justified by the vast quantities of drugs that the conspiracy injected into society, and by Navarro's "arrogant and malicious attitude toward the well-being of others," as manifested by his

"terrible threats."  There is nothing here that establishes a reasonable probability of a lower sentence on remand.

## III.

For the reasons stated above, McLean and Berguette's sentences are **vacated** and their cases are **remanded** for resentencing in accordance with this opinion.  Feliz's sentence is **affirmed**, and Navarro's conviction and sentence are **affirmed**.

**So ordered**.