# United States Court of Appeals
## For the First Circuit

No. 13-2127

UNITED STATES OF AMERICA,

Appellee,

v.

COREY RIDOLFI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Elizabeth Prevett for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

October 6, 2014

**HOWARD, Circuit Judge**. The defendant, Corey Ridolfi, was charged with federal firearms offenses after Cumberland, Rhode Island police found him at the wheel of a car whose trunk was jam-packed of stolen property, including two shotguns. After hearing evidence of Ridolfi's involvement in a recent burglary crime spree, the fruits of which were in the trunk of the car, a jury convicted him of being a felon in possession of one or more firearms and of knowingly possessing one or more stolen firearms. See 18 U.S.C. § 922(g)(1); id. §§ 2 & 922(j). On appeal, Ridolfi primarily challenges the evidentiary sufficiency for his knowing possession of the shotguns. We affirm his convictions.

## I

In the early morning hours of November 28, 2011, local police responded to a report of a suspicious person in a residential neighborhood of Cumberland, Rhode Island.[1] At around 4:15 a.m., a caller reported that a man had just rung his doorbell and then walked away from the house. Sergeant Jonathan Cook arrived on site in less than one minute and immediately approached the lone car (a Ford Focus) parked in the neighborhood, about 250-300 feet from the complaining residence. The two men in the vehicle matched the description given by the caller, including the

---

[1] As usual, we recite the record evidence in the light most favorable to the jury's verdict, along with all reasonable inferences drawn therefrom. See United States v. Burgos, 703 F.3d 1, 4 n.2 (1st Cir. 2012).

winter hats with ear flaps worn by both. Ridolfi was in the driver's seat; his cousin Jared Lemay was in the passenger's side.

Ridolfi explained to the officer that he had become lost traveling from his girlfriend's house and had pulled off the main road to use his GPS unit. Ridolfi began perspiring heavily as his conversation with Sergeant Cook continued. A second police officer, David Rosa, soon arrived to assist. He spoke with Ridolfi and Lemay separately, and both men denied ringing the doorbell at the nearby residence. Lemay told Officer Rosa that he had been with Ridolfi all night at the home of Ridolfi's girlfriend in North Attleboro, Massachusetts and that the two were heading to Cumberland where they lived.

Ridolfi's story was that he had spent the night with his girlfriend in North Attleboro and then called Lemay, who was in Woonsocket, Rhode Island, to pick him up. Ridolfi spontaneously displayed his cell phone to the officer as proof of the call. Officer Rosa remarked that the time notation showed that the call had just occurred minutes earlier at 4:08 a.m. and questioned how the two could have traveled such a distance in such a short time. Ridolfi had no explanation, and his nervous behavior increased.

Meanwhile, Sergeant Cook had learned that the Ford Focus was registered to Lemay's father, and that neither Ridolfi nor Lemay had a valid driver's license. He decided to arrest Ridolfi for driving without a valid license and to impound the car since

Lemay could not lawfully drive it. Before the tow truck arrived, Sergeant Cook and Officer Rosa conducted an inventory search of the Ford Focus and discovered, among other items, a 20-gauge shotgun shell in plain view on the back seat. When they opened the trunk to continue their accounting, the officers observed that it was filled with boxes and bags stuffed full. Sergeant Cook also noticed two rifle bags buried among the belongings. Because of the sheer volume of the trunk cache, he opted to complete the inventory at the police station. There, Sergeant Cook found that the rifle bags indeed contained two shotguns, a pump action 12-gauge and a bolt action 20-gauge, with the serial numbers etched off. A different officer cataloged the various other items.

The police later learned that most of the belongings in the trunk comprised stolen property from three recent home burglaries that occurred in the month of November 2011. In addition to the shotguns, the loot included a large quantity of baseball cards and other sports memorabilia, jewelry, watches, a cell phone, and a replica handgun. The shotguns, in particular, were connected to a burglary that had occurred at a Cumberland home some time during the overnight hours of November 8th and November 9th. Many items of women's jewelry also were stolen during that same burglary. Other stolen property recovered from the trunk, such as the large sports memorabilia collection, were connected to yet another burglary of a Cumberland home that was located directly

-4-

across the street from where Sergeant Cook found Ridolfi and Lemay parked in the Ford Focus. The testimony of the homeowner established that this burglary had occurred around the time that the two men showed up in the neighborhood.

The police also discovered that Ridolfi had sold some of the stolen jewelry connected to the early November burglary at a pawnshop in Woonsocket, Rhode Island, shortly after that theft had occurred. On November 9th, at around 5:30 p.m., Ridolfi, accompanied by Lemay and another individual, entered the shop, where Ridolfi sold ten pieces of jewelry for $1,200.00 in cash. While Ridolfi informed the store clerk that a family member had given him the jewelry, he later told the police that he had received the valuables from some unknown woman at a party. He also told the police that he had visited the pawnshop alone, unaware that the store's security recording debunked his tale.

Finally, the police learned that on November 11th, just a few days after the early November burglary, Ridolfi and Lemay went to a party at the home of Lemay's girlfriend. Amidst the festivities, Lemay decided to showcase one of the stolen shotguns to Ridolfi's sister and others, demonstrating how to use the pump action feature. Although Ridolfi also was at the party, the record does not indicate whether he was present in the room at the time that Lemay boasted the weapon.

The government subsequently levied two firearms charges against Ridolfi as earlier outlined.[2] In addition to the police account, witnesses from each of the three burglarized homes provided a description of the items stolen, as well as the approximate dates and times that their respective residences were burglarized. The homeowners also identified their property that the police had procured from the Ford Focus on November 28th. Additionally, a pawnshop document was admitted into evidence. It contained descriptions of the unique items of women's jewelry that Ridolfi had sold on November 9th, which were identical to the items that had been reported as stolen along with the shotguns. Finally, the parties stipulated to certain legal elements, such as that the shotguns were moved from one state to another and that Ridolfi previously had been convicted of a crime punishable by more than one year of imprisonment.

Lemay's father was the sole witness who testified for the defense. He confirmed that the Ford Focus was registered to him and explained that he had bought the car for his son, Lemay. He also testified that his son regularly loaned the car to other people, including Ridolfi.

Ridolfi unsuccessfully challenged the sufficiency of the evidence for both the felon in possession of a firearm charge

---

[2] The government also charged Lemay with knowingly possessing a stolen firearm, and the cousins faced trial together. This appeal concerns only defendant Ridolfi's resulting convictions.

(count I) and the knowing possession of a stolen firearm charge (count II).  The jury ultimately returned guilty verdicts against Ridolfi, and this timely appeal followed.

**II**

Ridolfi argues that the evidence is insufficient to prove that he knowingly possessed the firearms (an element common to counts I and II) and that he knew that the firearms were stolen (an element of count II).  We review de novo preserved challenges to the sufficiency of the evidence.  United States v. Rodríguez, 735 F.3d 1, 7 (1st Cir. 2013).  Applying a familiar standard, "we consider whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt."  Id. (internal quotation marks omitted); see Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).

As the district court informed the jury here, a guilty verdict may rest on reasonable factual inferences drawn from direct or circumstantial evidence, but not on insupportable or overly speculative evidentiary interpretations.  See United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012); United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).  And, it is within the jury's purview to evaluate competing factual inferences and theories that are supported by the evidentiary presentation.  See Jackson, 443

U.S. at 319; <u>United States</u> v. <u>Cruz</u>, 352 F.3d 499, 511 (1st Cir. 2003).

In urging reversal, Ridolfi cites to cases that include admonishments against improper stacking of factual inferences. <u>See</u> <u>United States</u> v. <u>Valerio</u>, 48 F.3d 58, 64 (1st Cir. 1995) (noting that "we are loath to stack inference upon inference in order to uphold the jury's verdict" (citing <u>Ingram</u> v. <u>United States</u>, 360 U.S. 672, 680 (1959))). Bare citation to this inference-stacking principle as a type of normative call, however, rings hollow. It is true that in certain contexts, such as prosecutions for conspiracy crimes and criminal fraud schemes, heightened caution sometimes may be warranted to ensure that the particular conviction does not depend upon too attenuated a link between the evidentiary presentation, the necessary predicate facts urged by the prosecutor, and the ultimate facts and legal elements of the charged offense. <u>See</u> <u>Ingram</u>, 360 U.S. at 680 ("'[C]harges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes.'" (citation omitted)).[3] Still, our focus when considering a sufficiency challenge always remains fixed on discerning whether the jury's guilty verdict finds support in a

---

[3] <u>See, e.g.</u>, <u>Burgos</u>, 703 F.3d at 11-17 (conspiracy conviction overturned); <u>O'Laughlin</u> v. <u>O'Brien</u>, 568 F.3d 287, 301-02 (1st Cir. 2009) (listing example cases); <u>Valerio</u>, 48 F.3d at 64-65 (reversing convictions for possession with intent to distribute and conspiracy).

plausible rendition of the record, which properly includes reasonable, common sense inferences drawn from the evidence. See Jackson, 443 U.S. at 318-19; United States v. DeCologero, 530 F.3d 36, 65 (1st Cir. 2008); United States v. Portalla, 496 F.3d 23, 27 (1st Cir. 2007).

**III**

We first address Ridolfi's challenge to the jury's finding that he knowingly possessed the shotguns. Knowing possession may be proven through either actual or constructive possession, and the government rests on the latter in this case. See United States v. Guzmán-Montañez, 756 F.3d 1, 8 (1st Cir. 2014).

Constructive possession of a firearm may be established when a person "knowingly has the power and intention at a given time of exercising dominion and control over [it] either directly or through others." United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005) (internal quotation marks omitted). Constructive possession may be sole or joint and does not require actual ownership of the firearm. Id. However, a person must have actual knowledge of the weapon in order to have constructive possession of it. Id. at 502-03.

Establishing a person's culpable knowledge, like specific intent, often depends on circumstantial evidence alone. See United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). For

-9-

constructive possession of a firearm in particular, the requisite knowledge and intention can be inferred from circumstances "such as a defendant's control over the area where the contraband is found (e.g., defendant's home or automobile)." McLean, 409 F.3d at 501; see United States v. Booth, 111 F.3d 1, 2 (1st Cir. 1997) (stating that "knowledge can be inferred in some circumstances from control of the area"). Knowledge must be fairly inferrable from the circumstances, however, and mere presence with or proximity to weapons, or association with another who possesses a weapon, is not enough. United States v. Rodríguez-Lozada, 558 F.3d 29, 40 (1st Cir. 2009); McLean, 409 F.3d at 501. The record must contain evidence of "some action, some word, or some conduct that links the individual to the [firearm] and indicates that he had some stake in it, some power over it." McLean, 409 F.3d at 501 (internal quotation marks omitted).

Here, Ridolfi claims that there is no "specific, particularized and individual" evidence linking him to the shotguns to establish that he knew of the weapons' existence and that he had the power and intention to exercise dominion and control over them. He emphasizes, for instance, that the record lacks any evidence showing his "special proximity to the firearms, access to the firearms, movement toward the firearms, prior handling of the firearms, or statements about the firearms" to support a finding of constructive possession.

Ridofli's position is spurious given his involvement with the stolen goods immediately following the early November burglary, the inculpatory events at the time of Ridolfi's arrest, his dominion over the car where the items were stored, and his false statement to the police during the ensuing investigation.

First, less than a day after the early November burglary in which the shotguns were stolen, Ridolfi, accompanied by his cousin Lemay, took the lead in selling several items of women's jewelry pilfered during that theft. Indicative of an inculpatory state of mind for (at a minimum) having handled stolen goods, Ridolfi gave inconsistent answers about the source of the jewelry that he had sold for over $1,000 cash. Then, just a few days later, Lemay showcased one of the stolen shotguns at a party that Ridolfi also attended. While there is no direct evidence that Ridolfi actually saw this bravado, a rational jury could fairly infer (again, at a minimum) that Lemay had displayed that prize from the early November burglary to the very person whom Lemay had accompanied when selling other treasure from that same crime -- Ridolfi. See United States v. Marek, 548 F.3d 147, 153-54 (1st Cir. 2008) (defendant's role in the criminal enterprise and close association with another participant allowed a reasonable inference of shared knowledge); United States v. Ortiz, 966 F.2d 707, 713-14 (1st Cir. 1992) ("the existence of a close relationship between a defendant and others involved in criminal activity can, as part of

-11-

a larger package of proof, assist in supporting an inference of involvement in illicit activity").

Next, during the early morning hours of November 28th, Ridolfi was found sitting in the driver's seat of his cousin's car, the trunk of which was packed full with stolen property from three November 2011 burglaries, including the shotguns from the early November theft. From a rational jury's perspective, the cousins were essentially caught red-handed having just burgled the Cumberland home across the street from where Ridolfi parked the Ford Focus: the loot in the trunk included property stolen from that home, and the homeowner established that the crime had occurred within the relevant time frame. The jury could have drawn yet another reasonable inference, as well: given their close proximity to the home whose owner had reported a suspicious man in the neighborhood, and their clothing matching that described by the caller, the cousins were about to embark on another burglary. Moreover, a nervous Ridolfi gave an implausible account to the police about his recent whereabouts. This response evinced his inculpatory mindset regarding his larcenous conduct that night and the stored spoils in the trunk. See United States v. Lochan, 674 F.2d 960, 966-67 (1st Cir. 1982) (defendant's significant dominion and control over the vehicle that he did not own, and surrounding suspicious circumstances, was material evidence of his knowing possession of the hidden contraband).

Ridolfi's significant control and dominion over his cousin's vehicle, which included the stored items in the trunk, is pertinent to his possession of the shotguns. By his own account (as testified to by the police witnesses), Ridolfi had called his cousin Lemay for a ride that night and took control of the car for the lengthy return drive to Cumberland. And, as we know, Sergeant Cook found Ridolfi in the driver's seat when he approached the Ford Focus. See Lochan, 674 F.2d at 966 (the defendant's control over a vehicle that he did not own "was not fleeting," which served as material evidence for his knowing possession of the hidden drugs); see also United States v. Robinson, 473 F.3d 387, 399 (1st Cir. 2007) (defendant's relationship with the person who actually rented the car he had been driving was material evidence for his constructive possession of the hidden firearms).

Finally, the jury was aware of Ridolfi's statements to police during the subsequent investigation. After having been found at the wheel of Lemay's car with spoils squirreled away in the trunk, Ridolfi opted to lie to the police about Lemay's presence with him during the pawnshop transaction on November 9th. The jury was entitled to infer that Ridolfi, a convicted felon, was seeking to disassociate from Lemay, particularly with respect to the early November burglary when the two shotguns were stolen.

All told, the evidence was sufficient to ground a finding that the cousins committed a string of burglaries in November 2011

and that they shared the plunder.  This plausible rendition of the record easily supports the essential facts that Ridolfi both knew of the shotguns and had a joint stake in them as part of the burglary spoils, fully intending to share in their possession and control.  See DeCologero, 530 F.3d at 67 (defendant's role in the criminal enterprise evinced that he could access and make use of the weapons cache at will, which served as material evidence to his constructive joint possession of the firearms); McLean, 409 F.3d at 504 (noting that "the gun was among the proceeds of the drug sales, which [defendant] was obliged to protect" as material evidence for his construction possession).

Ridolfi makes various attempts to distance himself from the stolen firearms by isolating aspects of the "evidence gleaned during his arrest."  Yet, the perceived record lapses, such as the lack of evidence that he made a movement toward the trunk when interacting with the police, are no impediment to a finding of constructive possession of the firearms on this record.  See United States v. Liranzo, 385 F.3d 66, 70 (1st Cir. 2004) ("The fact that the government did not present certain kinds of evidence does not mean that there was insufficient evidence for conviction."). Ridolfi argued his alternative theories at trial, and the jury remained free to discount them and find constructive possession on the whole of this record.  See United States v. Scott, 564 F.3d 34, 40 (1st Cir. 2009).

Furthermore, this case hardly represents one of guilt-by-association standing alone, as Ridolfi paints it.  Indeed, the cases that he relies on are meaningfully different from the circumstances presented here.  See, e.g., Rodríguez-Lozada, 558 F.3d 29; McLean, 409 F.3d 492; see also United States v. Chairez, 33 F.3d 823 (7th Cir. 1994); United States v. Pedro, 999 F.2d 497 (11th Cir. 1993).  The evidence of Ridolfi's dominion and control over the area where the shotguns were found is far more pronounced, as is the evidence of his direct involvement in the criminal enterprise in which the shotguns were part of the bounty that he shared with his cousin.[4]

In short, the jury's finding that Ridolfi knowingly possessed the shotguns found in the trunk is eminently supportable on this record.

This leaves Ridolfi's brief challenge to the jury's finding that he knew the shotguns were stolen, an element exclusive to his count II conviction.  For this element, the government was required to prove that Ridolfi knew or had reasonable cause to

---

[4] By contrast, the defendant in Rodríguez-Lozada, for instance, was a temporary visitor of the apartment (albeit a member of a drug trafficking conspiracy), only a single personal belonging of his was present in the room where guns were hidden, and the room's sole occupant was the individual whom the police had just seen in actual possession of a firearm.  558 F.3d at 40-41.  And, in Pedro, the defendant's cohort in an alleged burglary that had just occurred was carrying a gun in a suitcase, and the evidence was wholly lacking on whether the defendant was ever aware that a gun was part of the loot taken.  999 F.2d at 501-02.

believe that the firearms were stolen.  18 U.S.C. § 922(j).  The government contends that Ridolfi did not challenge the evidentiary sufficiency of this element before the district court, and Ridolfi does not address the purported trial record lapse in his reply brief.  We need not sort out the appellate review standard, <u>see</u> <u>United States</u> v. <u>Marston</u>, 694 F.3d 131, 134-45 (1st Cir. 2012), because the rational inferences outlined in our constructive possession discussion also permitted a rational jury to find that Ridolfi knew or had reasonable cause to believe that the shotguns were stolen.

In particular, the evidence surrounding the pawnshop transaction and Lemay's bravado at the party provides solid grounding for the jury to have found that Ridolfi knew of the shotguns and had reasonable cause to believe that they were stolen. And that, of course, was not all.  The evidence resulting from the events of November 28th and Ridolfi's later dissembling with the police lend further evidentiary support for the finding.

**IV**

Because the jury's determinations firmly rest on the evidence, we **<u>affirm</u>** Ridolfi's firearms convictions.