# United States Court of Appeals
## For the First Circuit

No. 22-1421

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL PINA-NIEVES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch, Circuit Judge,
and Kelley, District Judge.*

Martin G. Weinberg, with whom Kimberly Homan was on brief,
for appellant.
Kevin Barber, United States Department of Justice, with whom
W. Stephen Muldrow, United States Attorney, Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, Gregory Conner, Assistant United States Attorney,
Kenneth A. Polite, Jr., Assistant Attorney General, and Lisa H.
Miller, Deputy Assistant Attorney General, were on brief, for
appellee.

---

* Of the District of Massachusetts, sitting by designation.

January 30, 2023

**BARRON**, <u>Chief Judge</u>.  Rafael Pina-Nieves challenges his 2021 convictions in the United States District Court for the District of Puerto Rico for, respectively, possessing firearms and ammunition as a felon in violation of 18 U.S.C. § 922(g)(1) and possessing a machinegun in violation of 18 U.S.C. § 922(o).  We affirm the former conviction but reverse the latter because it is not supported by sufficient evidence.

## I.

In 2015, Pina-Nieves, a music producer and business owner, pleaded guilty in the District of Puerto Rico to one count of bank fraud, a felony, in violation of 18 U.S.C. §§ 1344 and 2.  That conviction made it a federal offense under § 922(g)(1) for Pina-Nieves to possess a firearm or ammunition.

In 2020, the Federal Bureau of Investigation ("FBI"), while investigating a money-laundering operation, obtained a court order to wiretap phone lines at a gas station in Puerto Rico that Pina-Nieves owned.  Through the wiretap, the FBI intercepted a telephone call on February 6 of that year between Pina-Nieves and one of his employees, Joed Romero-Soler.  The call concerned renovating a house that Pina-Nieves owned in Caguas Real, a gated community in Caguas, Puerto Rico, so that the house could be rented or sold.

The following exchange occurred during the call, which took place in Spanish, according to the transcript that sets forth the official translation:

> **Pina-Nieves**: And what do we do with the safe, motherfucker?
>
> **Romero-Soler**: Bro, right. You have that there built-in. A whole ordeal, right? No, man, leave it open.
>
> **Pina-Nieves**: Man, yes.
>
> **Romero-Soler**: You know, and take out whatever you have . . . and, if you have anything . . . and leave it open behind there so that whoever moves in there will use it. You know, tell Miguel to reset it. You know, that, look . . .
>
> **Pina-Nieves**: Nah, nah, bro, I have money and I have all sorts of things in there: my guns, rifles, bullets.
>
> **Romero-Soler**: Well, exactly, have Miguel take out anything he needs to take out. You know what you have in there, right?
>
> **Pina-Nieves**: Yes, but no, no . . . I'm not giving that motherfucker anything.
>
> **Romero-Soler**: Well, I don't know . . . and . . . and . . . you know, and the guns? Give them to Johnny.
>
> **Pina-Nieves**: No, because all of that is [unregistered].
>
> **Romero-Soler**: Nah, I'll wait until you get here. I mean, yes, yes, when you get here . . . I mean, it's alright. Anyway. . . . Um, yes, when you come, well . . . you know, take out whatever you need to take out and all that and . . . and that's it.

>**Pina-Nieves:** No, but the thing is I can't take it out either. That . . . well, yes. . . . The thing is I don't have . . . I would have to put . . . I would have to put a safe somewhere that's not . . . you know, here, in this house, it can't be done, because there's no space. This is really small.

FBI agents executed a warrant to search the Caguas Real house on April 1, 2020. The search revealed a hidden door and keypad behind a full-length, floor-to-ceiling mirror, estimated to be "eight to 10 feet" wide, in the master bedroom. The door led to a hidden room that contained one Smith & Wesson pistol, one Glock pistol, multiple boxes of ammunition, various firearm magazines, a bayonet, a holster, a satellite phone, and a safe holding more than $135,000 and €10,000 in cash and a certificate bearing Pina-Nieves's name. The Glock pistol had been modified to fire fully automatically with a single pull of the trigger.

A grand jury indicted Pina-Nieves in the District of Puerto Rico on August 13, 2020 on two counts. Count One charged Pina-Nieves with violating 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition." Count Two charged him with violating 18 U.S.C. § 922(o), which makes it "unlawful for any person to transfer or possess a machinegun." A "machinegun" under § 922(o) is "any

- 5 -

weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." United States v. Nieves-Castaño, 480 F.3d 597, 599 (1st Cir. 2007) (quoting 26 U.S.C. § 5845(b)).

Pina-Nieves was convicted on both counts after a brief trial and sentenced to 41 months' imprisonment. This appeal followed.

## II.

We start with Pina-Nieves's contention that his § 922(o) conviction must be reversed because it is not supported by sufficient evidence. To convict Pina-Nieves of the § 922(o) charge, the government was required to prove beyond a reasonable doubt that: (1) he knowingly possessed a machinegun on or about April 1, 2020; and (2) he had knowledge that the firearm had the characteristics that brought it within the statutory definition of a machinegun under § 922(o) (though not that he knew that those characteristics made the weapon a machinegun). See Staples v. United States, 511 U.S. 600, 602 (1994); Nieves-Castaño, 480 F.3d at 599.

Pina-Nieves's sufficiency challenge focuses solely on what the record shows regarding whether he knew the machinegun that he was convicted of possessing at the relevant time -- namely, the modified Glock pistol that the FBI agents found on April 1,

2020 in the hidden room of his Caguas Real house's master bedroom -- had the characteristics that made it a machinegun under § 922(o).  To succeed on this challenge, Pina-Nieves must show that no rational juror could find beyond a reasonable doubt that Pina-Nieves knew that the modified Glock pistol had those characteristics.  Jackson v. Virginia, 443 U.S. 307, 318 (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.").  Our review is de novo, although we must review the evidence in the light most favorable to the verdict.  United States v. Kanodia, 943 F.3d 499, 505 (1st Cir. 2019).

**A.**

Pina-Nieves contends that the record shows that the evidence was not sufficient because the government failed to present any direct or circumstantial evidence that could support a reasonable inference that Pina-Nieves had "ever set eyes on the [modified Glock pistol], much less examined it or fired it."  He notes, for example, that the government did not introduce evidence that his fingerprints were found on the gun.  He adds that the record contains no evidence that he was the one who purchased the gun, which the record shows was bought in 2016 in Ohio.  He notes,

- 7 -

too, that the record contains no evidence to indicate that the gun had been modified to make it a machinegun at the time that it was purchased.

Pina-Nieves goes on to contend that these features of the record take on particular significance due to the absence of any evidence that, although Pina-Nieves owned the Caguas Real house "on or about April 1, 2020," he lived at that residence during that time. Indeed, he notes, there is substantial evidence to show that he was living at that time either elsewhere in Puerto Rico or in Florida, as well as evidence that others had access to both the house and the area where the gun in question was found during the search on April 1, 2020. Moreover, Pina-Nieves points out, there is no direct evidence in the record of his having been present in the Caguas Real house at any time after the Glock pistol was purchased in Ohio in 2016.

Pina-Nieves winds up his sufficiency challenge by emphasizing that there is no evidence in the record -- direct or circumstantial -- as to when, from the time of the weapon's purchase in Ohio in 2016 to its discovery in his Caguas Real house on April 1, 2020, it had been modified to be a machinegun. In consequence, although Pina-Nieves does not dispute that the gun in question is a machinegun under § 922(o) or that it was found in his Caguas Real house on April 1, 2020, he contends that, given that there is no evidence to indicate that he was at that house on

that date, the mere presence of that gun in that house on that date cannot suffice to permit the reasonable inference that he knew that the gun had the characteristics of being able to fire automatically.

**B.**

To counter Pina-Nieves's argument, the government emphasizes that it may make its case about his knowledge of the characteristics of the weapon in question based on circumstantial evidence. See United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014). It then contends that the record suffices to show that Pina-Nieves constructively possessed the firearms found in his Caguas Real house on April 1, 2020, that one of those guns was a modified Glock pistol that qualifies as a machinegun under § 922(o), that the external modification that made the Glock pistol fully automatic was visible, that Pina-Nieves was acquainted with a range of weapons and firearms, and that the machinegun in question was found not just in a house that Pina-Nieves owned but in a hidden room attached to the master bedroom in that house.

Moreover, the government points to what Pina-Nieves was heard saying during the intercepted February 6 call. Here the government notes that, in addition to what Pina-Nieves concedes in his briefing to us was his reference to "pistols" during that call, the transcript of the phone call shows that he referred on it to "my guns" being "unregistered." The government contends that the

description of the guns being "unregistered" is significant because machineguns cannot be registered under federal law. Thus, the government argues, that description provides support for the inference, when the evidence is considered as a whole, that Pina-Nieves knew that one of the guns to which he was referring at that time had the characteristics of a machinegun.

## C.

The evidence certainly suffices to tie Pina-Nieves to the modified Glock pistol found in his house on April 1, 2020. In fact, Pina-Nieves does not dispute on appeal that the evidence suffices to show that he was in constructive possession of that firearm as of that date. But, we have made clear that a juror may not reasonably infer merely from the fact that one constructively possesses a machinegun that the defendant knows what he must under § 922(o) about the characteristics of that weapon. See Nieves-Castaño, 480 F.3d at 599-600.

Moreover, although Pina-Nieves does concede in his briefing to us that he referred on the February 6, 2020 call to "pistols," this limited description of those weapons is not direct evidence that he knew that either weapon had the characteristics of a machinegun. In addition, his reference on that call to "my guns" being "unregistered" fails to assist the government in fending off the sufficiency challenge, because his prior felony conviction equally could explain why he could not register a

- 10 -

firearm.  Indeed, we note that the April 1, 2020 search that turned up the modified Glock pistol at Pina-Nieves's Caguas Real house discovered two pistols, not one, and yet only one of them qualified as a machinegun under § 922(o).

Of course, we cannot look at each piece of evidence in isolation.  United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).  But, even when we consider the evidence as a whole, we are persuaded by Pina-Nieves's argument that the government's theory of sufficiency impermissibly depends either on speculative inferential leaps or the stacking of inference upon inference.  See United States v. Guzman-Ortiz, 975 F.3d 43, 52-56 (1st Cir. 2020).

To conclude that Pina-Nieves not only was in possession of a machinegun "on or about April 1, 2020" but also knew that the machinegun could fire fully automatically, a juror would have to infer that Pina-Nieves had either seen it for long enough to become familiar with the characteristics of it that made it a machinegun or had been told at some point that it had those characteristics even though he had never seen it.

But, as we have explained, there is no evidence in the record that shows when the Glock pistol was modified, reports anyone having told Pina-Nieves that the weapon had been so modified, or places Pina-Nieves at his Caguas Real house at any time after the Glock pistol's 2016 purchase in Ohio.  Moreover,

there is evidence that he was living elsewhere from at least 2010 on, as well as evidence that others were in the house during that time with access to the area where the gun was found.  Thus, while Pina-Nieves does not dispute that the evidence suffices to show that he constructively possessed the weapon within the relevant time frame and that it was found in a house that he owned during that same time frame, we do not see how a rational juror could make the requisite inference that Pina-Nieves knew that this weapon had the characteristics of a machinegun other than by engaging in just the kind of speculation or inference-stacking that cannot suffice to support a conviction.

**D.**

The government does contend that our precedent requires that we conclude otherwise by pointing to our decisions in United States v. Laureano-Pérez, 797 F.3d 45 (1st Cir. 2015), United States v. Shaw, 670 F.3d 360 (1st Cir. 2012), and United States v. Giambro, 544 F.3d 26 (1st Cir. 2008).  But, we do not agree.

In Shaw, the government presented evidence that the defendant had recently handled the gun in question.  670 F.3d at 364 (the defendant fired the modified gun and "deftly" unloaded it).  And, in Giambro, the government presented evidence that the defendant had seen the gun and was therefore familiar with the obvious "external indications signaling the nature of the weapon."

544 F.3d at 30-31 (quoting Nieves-Castaño, 480 F.3d at 601).  There is no such evidence in the record here.

Moreover, the record in Laureano-Pérez also is not like the record here.  In that case, one of the defendants, Jeffrey Cummings-Ávila, argued that the evidence did not suffice to support his § 922(o) conviction because the evidence did not suffice to establish beyond a reasonable doubt that he knew that the pistols that had been found in a closed red and black bag during a search of his apartment had the characteristics of a machinegun -- even though the evidence did suffice to show that each of the pistols found in that bag did have those characteristics.  See Laureano-Pérez, 797 F.3d at 74.  The defendant contended that was so because "the government provided no evidence that [Cummings-Ávila] opened up the bag or was told what the bag contained."  Id. at 75.

We held, however, that "the cumulation" of four different strands of "circumstantial evidence" present in the record in that case was "just enough to sustain" the conviction.  Id. at 76.  First, we pointed to the evidence that Cummings-Ávila "often stored guns and drugs" for a large, armed drug organization.  Id. at 75.  Second, we explained that the evidence of Cummings-Ávila's role in the organization indicated that he was "trusted by his co-conspirators," which mattered because "positions of trust often come with increased access to

- 13 -

information."  Id.  Third, we pointed to the evidence that Cummings-Ávila was "close" to the organization's leader, as we concluded that a rational juror could conclude from this evidence of their closeness that the leader "would have confided in [Cummings-Ávila] regarding the details of the bag" that was found in his apartment that contained the machineguns.  Id. at 75-76. Finally, we pointed to testimony of a witness having seen Cummings-Ávila firing .40- or .45-caliber pistols that had been modified to fire automatically shortly before Cummings-Ávila was given the bag in question.  Id. at 74, 76.

There is no circumstantial evidence of the requisite knowledge in the record before us here that is like the evidence that we held was sufficient in Laureano-Pérez, a case that we deemed to be "close," id. at 75.  For example, there is no witness testimony that Pina-Nieves had at any time (let alone in close proximity to the period from February 6, 2020 to April 1, 2020) handled a pistol that had been modified to be a machinegun or learned that a weapon that was his had been so modified.  Moreover, there is no evidence that Pina-Nieves often stored guns for a criminal organization, much less evidence that he was sufficiently close to the leader of such an organization that he would have been informed of the details of the weapons he stored.

And, while the record shows a machinegun was found in a house Pina-Nieves owned, no evidence places him in that house at

a time when the machinegun was known to have been in its modified state. In fact, as we have noted, substantial evidence indicates that Pina-Nieves was not living there in the years leading up to the weapon's discovery in that house and that others had access to it in full.

Our conclusion that the evidence is not sufficient also aligns with the out-of-circuit precedent that the defendant cites. See United States v. Rogers, 94 F.3d 1519, 1521-23 (11th Cir. 1996) (reversing the defendant's § 922(o) conviction "[b]ecause the Government did not introduce any evidence showing that [the defendant] was aware that [the modified pistol in question] had been altered to operate as a fully automatic weapon," even though the pistol was discovered in a black bag beneath the driver's side seat of the defendant's truck, the defendant had been driving the truck at the time, the defendant "correctly identified" the pistol during an interview with a special agent from the Bureau of Alcohol, Tobacco, and Firearms, and the pistol had been manufactured as a semi-automatic weapon); United States v. Michel, 446 F.3d 1122, 1130-32 (10th Cir. 2006) (reversing the defendant's conviction for possession of an unregistered sawed-off firearm that also lacked a serial number in violation of 26 U.S.C. § 5861(d) and 5861(i) because "the government presented absolutely no evidence that [the defendant] ever observed or handled" the gun in question and thus could not support the "inferential leap"

- 15 -

required for the jury to find that he had knowledge of the gun's characteristics).

In fact, the government does not attempt to address Rogers and contends that Michel's reasoning has no application to this case for reasons that we find unpersuasive. The government contends that Michel has little bearing here because it establishes merely that a "fleeting encounter was not enough to establish the defendant's familiarity with the gun and its characteristics." But, Michel focused on the brief nature of the defendant's encounter with the weapon there to explain why there was not sufficient evidence to prove beyond a reasonable doubt that the defendant was familiar with the characteristics of that weapon that made it a sawed-off firearm. See Michel, 446 F.3d at 1130-32. And here, given all the evidentiary gaps that we have described, a juror could no more reasonably infer from the nature of Pina-Nieves's tie to the weapon in question that it was beyond a reasonable doubt that he had seen the modifications that had transformed it into a machinegun than a juror could have in Michel.

**E.**

In sum, even though the government has sufficiently proved Pina-Nieves's constructive possession of the modified Glock pistol on or about April 1, 2020, based on the circumstantial evidence that is in the record, the government was required to prove more to secure this conviction. And Pina-Nieves has

persuasively made the case that the government failed to do so because it failed to identify any evidence in the record that could support a finding beyond a reasonable doubt that he knew as of the relevant time that the modified Glock pistol found had been so modified. See Nieves-Castaño, 480 F.3d at 602. Thus, we conclude that Pina-Nieves's § 922(o) conviction must be reversed.

## III.

Pina-Nieves separately contends that both his § 922(o) conviction and his § 922(g)(1) conviction must be vacated due to trial errors. The first claimed error concerns the District Court's decision to admit certain evidence pursuant to Federal Rule of Evidence 801(d)(2)(C) and (D). The second claimed error concerns the District Court's decision to exclude certain evidence on relevancy grounds pursuant to Federal Rule of Evidence 401.

We need not address Pina-Nieves's contention that his § 922(o) conviction must be vacated due to these asserted trial errors because it must be reversed on sufficiency grounds. We do, however, need to address his contention that these claimed trial errors require that we vacate his § 922(g)(1) conviction. Our review is for abuse of discretion because Pina-Nieves asserted each error below. See United States v. Velazquez-Fontanez, 6 F.4th 205, 219 (1st Cir. 2021). But, although we are persuaded that the District Court did make the two asserted errors, they do not require that we overturn the conviction because we agree with the

- 17 -

government that the errors were harmless as to that conviction. See <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 56 (1st Cir. 2002). And that is so, we add, even if we were to consider their cumulative effect.

**A.**

We begin with the claimed error that implicates Rule 801. We will first set forth the relevant facts. We will then explain why we conclude that there was error.

**1.**

Three days before the first day of trial, Pina-Nieves filed a motion to dismiss the indictment. Pina-Nieves's trial counsel, Francisco Rebollo-Casalduc, signed and filed the motion.

The motion argued that the government had violated Pina-Nieves's Sixth Amendment right to counsel by engaging in prosecutorial misconduct, including by placing an informant in the defense camp who reported to the government "the content and substance of the confidential communications between Mr. Pina-Nieves and his attorneys." The motion further argued that the information reported included Pina-Nieves's "personal evaluation of plea offers and counter offers and [Pina-Nieves's] thoughts on potential defense trial strategies." And, the motion contended, the government's alleged misconduct prejudiced Pina-Nieves because the information that the government received

- 18 -

had caused federal prosecutors to harden their plea-bargaining position such that the "bottom line . . . involved time in prison."

At one point, the motion stated the following:

> As Exhibit 1 reflects, on October 2, 2020, the government informant, whose name is blacked out in the report, informed case agent Justin Turner that "Pina had a meeting with his attorneys, after having received evidence form [sic] the U.S. Attorney's Office associated with his pending charges and trial. As a result, Pina gathered his family and associates on his new yacht to discuss the case. Pina was advised by his attorneys he will most likely have to spend time in prison, as a result of the charges. Pina's attorneys will reach out to the U.S. Attorney's Office in the near future to broker a plea agreement. During the meeting on the yacht, Pina prepared his family and associates for the likelihood of his serving time in prison and handed down his responsibilities to his associates on how to run the business in his absence." <u>Just the fact that the government learned that the defendant was resigned to the fact that he would have to spend time in prison is a tremendous advantage to have in plea negotiations</u>. Indeed, the clients the undersigned counsel represents typically would not accept a plea offer involving a prison sentence under any circumstances, and that is a tremendous advantage to have in plea negotiations. Here, Mr. Pina-Nieves lost that advantage, and any upper hand or leverage, in his plea negotiations, on account of the government's violation of his sacred right to confidential attorney-client communications. With this advantage, the government could adjust its negotiation strategy, knowing it could always maintain a string [sic] hand and a bottom line which involved time in prison. This makes the plea negotiations which have taken place to date, and any that could have taken place in the future, a complete sham.

- 19 -

(Emphasis added).

The government opposed the motion. But, in doing so, the government notified Pina-Nieves that it intended to admit into evidence pursuant to Rule 801(d)(2)(C) and Rule 801(d)(2)(D) the sentence from the motion's above-quoted passage that we have underlined: "Just the fact that the government learned that the defendant was resigned to the fact that he would have to spend time in prison is a tremendous advantage to have in plea negotiations."

Rule 801(d)(2) provides in relevant part that a statement is not hearsay if it is "offered against an opposing party and: . . . (C) was made by a person whom the party authorized to make a statement on the subject; [or] (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Rule 801(a) defines a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."

Pina-Nieves opposed the admission into evidence of the sentence in question on the ground that it did not fall within either Rule 801(d)(2)(C) or Rule 801(d)(2)(D) and was not otherwise admissible. The District Court disagreed after concluding that, "[a]s defense counsel, Rebollo is authorized to represent Pina before the Court. Rebollo's statements are, thus, attributable to

Pina." <u>United States</u> v. <u>Pina-Nieves</u>, 575 F. Supp. 3d 270, 275 (D.P.R. 2021).

Pina-Nieves continued to object at trial to the admission of the sentence in question on the ground that it did not fall within either Rule 801(d)(2)(C) or Rule 801(d)(2)(D), but to no avail. In addition, Pina-Nieves objected to the government's request on the first day of trial that the District Court take "judicial notice" of the sentence in the motion to dismiss. The District Court nonetheless instructed the jury, prior to the calling of any witnesses, as follows:

> Judicial notice is taken that on December 11, 2021, counsel for Defendant Rafael Pina-Nieves made the following statement in a motion filed in the Electronic Docket and Case Management System in this court, at Entry Number 168, as follows: Quote:
>
> Just the fact that the government learned that the defendant was resigned to the fact that he would have to spend time in prison is a tremendous advantage to have in plea negotiations.
>
> This judicially-noticed fact can be so accurately and readily determined that it cannot be reasonably disputed. You may, therefore, reasonably treat this fact as proven, even though no evidence has been presented on this point.
>
> As with any fact, however, the final decision whether to -- whether or not to accept it is for you to make. You are not required to agree with me.

At the close of evidence, and over Pina-Nieves's objection, the District Court repeated this instruction almost verbatim. The government then began its closing argument by quoting the sentence at issue and arguing that it was "evidence of consciousness of guilt." The government also included the sentence in large text in a PowerPoint presentation it used during closing argument and rebuttal. During its rebuttal, the government revisited the sentence at issue, calling it "incriminating evidence coming also from the defense camp." Then, after quoting the sentence once more, the government stated: "That wasn't a witness that we brought to testify something the defendant told that witness. No. No. No. That was the defense attorneys in black and white, in a motion. Two words come to mind from our behalf: Thank you. More evidence of guilt."

**2.**

The government contends that the "just the fact that" sentence is a "written assertion," see Rule 801(a), and so a "statement" within the meaning of Rule 801(d)(2)(C) and 801(d)(2)(D). That is so, the government contends, because the sentence makes a legal argument about why the government's alleged misconduct would be prejudicial that has "embedded" within it an assertion of fact about Pina-Nieves's state of mind.

The government goes on to contend that the sentence qualifies as an admissible statement under those subsections of

Rule 801(d)(2). That is so, according to the government, because the assertion of fact that the sentence makes about Pina-Nieves's state of mind is attributable to Pina-Nieves himself, given that Pina-Nieves's counsel, Rebollo-Casalduc, filed the motion that contains the sentence.

But, the introductory phrase "just the fact that" in the sentence at issue is most naturally read to be merely the colloquial means by which the beginning of the sentence conveys the consequence that is then spelled out in the remainder of that sentence. So understood, the sentence is most naturally read merely to be making a legal argument about the prejudice that would follow if the government had "learned" a certain fact about Pina-Nieves's state of mind through alleged misconduct, rather than to be making such a legal argument while also asserting that the government had learned of any fact about Pina-Nieves's state of mind.

The government does point out that the motion to dismiss the indictment argues that the government's misconduct prejudiced Pina-Nieves by enabling the government to obtain access to information about Pina-Nieves's state of mind and that this access to that information in turn gave the government an "extra advantage in plea negotiations." The government goes on to contend that it could have obtained that "extra advantage" only if Pina-Nieves was, in fact, resigned to spend time in prison. Thus, the

government argues, the sentence in question, when read in the context of the motion as a whole, must be read to be impliedly making the factual assertion that Pina-Nieves was so resigned and not merely to be making the legal argument that the government's misconduct would be prejudicial if the government had learned that Pina-Nieves had that state of mind.

We must focus, however, on what the sentence that was admitted into evidence pursuant to Rule 801 itself says. It is that sentence -- and that sentence alone -- that was deemed to qualify as a "statement" admissible under Rule 801. Yet, with that focus in mind, we conclude that the government's "reading is not compelled by the language of the [sentence]," Harrington v. City of Nashua, 610 F.3d 24, 31 (1st Cir. 2010).

True, the sentence appears as part of the motion's broader argument about how the government's asserted misconduct is prejudicial. But, the sentence does not make an assertion about what Pina-Nieves's state of mind was or even a representation that the government had learned of his state of mind. It explains how prejudice could flow from the government having "learned" such a "fact" without thereby itself asserting that the government had learned any such fact.

Nor need the sentence have made any such factual assertion to have advanced the broader prejudice argument that the motion to dismiss the indictment makes. In context, the sentence

served the useful function of spelling out how the government's knowledge of a fact about Pina-Nieves's state of mind with respect to being resigned to spend time in prison could have hurt Pina-Nieves in plea negotiations insofar as the government had such knowledge.

Thus, the government fails to demonstrate that the sentence in question included an assertion of fact about Pina-Nieves's state of mind within the legal argument that it was making about prejudice. See id. Accordingly, we agree with Pina-Nieves that the District Court abused its discretion in admitting the sentence in question pursuant to Rule 801. See Gill v. Maciejewski, 546 F.3d 557, 563 (8th Cir. 2008) (counsel's statements during a criminal trial not admissible under Fed. R. Evid. 801(d)(2)(C) or (D) where opposing party took "unwarranted liberties with the context of the statement"); United States v. Blood, 806 F.2d 1218, 1221 (4th Cir. 1986).

**B.**

We now turn to the claimed error by the District Court that implicates Rule 401. It concerns the District Court's exclusion of the testimony of Pina-Nieves's realtor in Miami, Florida, Jordan Millman. We first lay out the pertinent facts. We then explain why we conclude that there was error.

**1.**

On the sixth day of trial, Millman testified that he met Pina-Nieves at the end of 2010, when Pina-Nieves was looking at apartments in Miami, and that Millman had personal knowledge of Pina-Nieves living in Miami in 2010 because Millman lived in the same building. The government then objected to Millman's testimony, pursuant to Federal Rule of Evidence 401, which provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

The District Court struck the testimony from Millman that he had already provided and barred the remainder. Pina-Nieves subsequently made the following offer of proof to no avail:

> [Millman] would have testified that in 2010, he assisted Mr. Pina in renting an apartment at the Epic, that he lived in that apartment through 2013. That in 2013, that apartment was sold, and he moved to Aventura, and that in 2016, he assisted Mr. Pina in starting to -- towards the end of 2016, in starting to look for properties to buy, that he purchased an apartment in 2019. He has personal knowledge that he lived there, and that he sold that apartment in 2021 and bought a house in north Miami.

**2.**

Our standard of review for a Rule 401 ruling by a district court is quite deferential, given the trial judge's closeness to the record. See Bielunas v. F/V Misty Dawn, Inc.,

621 F.3d 72, 76 (1st Cir. 2010). Nonetheless, "[r]elevancy is a very low threshold . . . . And 'the evidence need not definitively resolve a key issue in the case,' but rather 'need only move the inquiry forward to some degree.'" United States v. Cruz-Ramos, 987 F.3d 27, 42 (1st Cir. 2021) (quoting Bielunas, 621 F.3d at 76).

Pina-Nieves no doubt could have been clearer in explaining to the District Court how the testimony from his realtor would have advanced his defense. Nonetheless, we are persuaded that the excluded Millman testimony crossed the low threshold for relevance that Rule 401 establishes.

According to Pina-Nieves's proffer, Millman would have testified that he had "personal knowledge" that Pina-Nieves "lived" in the Miami apartment that he purchased in 2019 and that he did not sell that apartment until 2021. That testimony was relevant to Pina-Nieves's contention that he was so distant from the Caguas Real house that he could not have either intended to exercise dominion and control over the weapons in question or known of the characteristics of the modified Glock pistol that made it a machinegun.

Millman's testimony also provided support for finding that Pina-Nieves had residences outside of Puerto Rico from prior to the time that the modified Glock pistol had first been purchased in Ohio in 2016 through the time he is alleged to have

constructively possessed the weapon. In that respect, too, then, Millman's testimony would have "move[d] the inquiry forward to some degree" by bolstering Pina-Nieves's contention that he was sufficiently removed from the goings-on at the Caguas Real property on or about April 1, 2020 that he lacked both the intent to exercise dominion and control over the weapons found there at that time and the knowledge of the characteristics of the modified Glock pistol that made it a machinegun.

## C.

We turn, then, to the government's arguments that each of the errors was harmless. And, that is, the government contends, even if we account for their cumulative effect. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). For the reasons we will next explain, we agree with the government.

To prove that Pina-Nieves was guilty of the § 922(g)(1) charge, the government was required to prove beyond a reasonable doubt that Pina-Nieves was a felon who possessed firearms or ammunition on or about April 1, 2020. Pina-Nieves stipulated that he became a felon in 2015. Thus, the only element in dispute is the possession element, which the government contends is satisfied solely due to the evidence in the record that it contends shows that Pina-Nieves constructively possessed firearms or ammunition at the time specified in the underlying charge.

To show such constructive possession, the government was required to prove beyond a reasonable doubt that, on or about April 1, 2020, Pina-Nieves knowingly had the power and intention of exercising dominion and control over firearms or ammunition. See United States v. Tanco-Baez, 942 F.3d 7, 25 (1st Cir. 2019). And to so prove, the record, as a whole, "must contain evidence of 'some action, some word, or some conduct that links the individual to the [firearm] and indicates that he had some stake in it, some power over it.'" Ridolfi, 768 F.3d at 62 (alteration in original) (quoting United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005)).

The wrongly admitted Rule 801 evidence was plainly highly prejudicial with respect to any disputed element and thus with respect to the possession element. See United States v. Canty, 37 F.4th 775, 792 (1st Cir. 2022). Indeed, the government emphasized that evidence in its closing argument and rebuttal and described it as "incriminating," while also stating that it came from the "defense camp."

In addition, the Millman testimony was relevant to the question of Pina-Nieves's constructive possession of the firearms and ammunition in question as of the date set forth in the underlying charge. And, while the government contends that the Millman testimony was merely cumulative of other evidence that showed that "Pina resided during the pertinent time period in

places other than the Caguas Real house," it would have added, with respect to Pina-Nieves's connection to the Miami apartment, Millman's "personal knowledge that [Pina-Nieves] lived there" from 2010 through 2021. That testimony also would have provided, as Pina-Nieves contends, details about "Pina's more recent acquisitions of property, and residence in, Miami" while the "development of Millman's relationship with Pina over time would have provided important background regarding how Millman and Pina became sufficiently close friends that Millman was in a position to have personal knowledge of how much time Pina spent in Miami."

Nonetheless, the question we must answer in assessing harmless error is not merely whether the two errors, either alone or in combination, had <u>some</u> prejudicial effect as to the possession element, as they surely did. The question is whether the government has met its burden to show that it is "highly probable" that the errors, even if considered in combination, did not affect the guilty verdict on the § 922(g)(1) charge. See <u>Piper</u>, 298 F.3d at 56; <u>Sepulveda</u>, 15 F.3d at 1195-96. And, in answering that question, we cannot ignore the strength of the evidence of guilt with respect to the conviction at issue, see <u>Sepulveda</u>, 15 F.3d at 1196, which we conclude is overwhelming as to Pina-Nieves's constructive possession.

Pina-Nieves does argue -- based on the "outsized stress" that the government placed on the wrongly admitted "just the fact

that" sentence -- that the Rule 801 error was not harmless because "the government knew full well the devastating impact the evidence would have upon the jury's ability to fairly weigh the evidence against Pina." Pina-Nieves nowhere disputes in his briefing to us, however, the government's contention that he could be convicted on the charged § 922(g)(1) offense based on his having constructively possessed firearms or ammunition on February 6, 2020. And that is significant because, as Pina-Nieves admits, the transcript of the February 6 phone call shows that he referred in that call, which concerned what was in the Caguas Real house, to "my guns" -- or, as he concedes in his briefing, "pistols" -- as well as ammunition being there.

To be sure, Pina-Nieves contends that the transcript does not show -- let alone overwhelmingly -- that he had the intent to exercise dominion and control over any such weapons. He argues that the transcript shows, in fact, the opposite, as he contends that it shows that he "declin[ed] to exercise dominion and control" over the guns and bullets to which he referred on the phone call and "even indicat[ed] that he cannot exercise dominion and control over them." Thus, on his telling, the transcript of the February 6 call shows him "rejecting every suggestion of what might be done with the weapons and ammunition and deferring any decision until he returned to Puerto Rico at some unspecified time in the future."

But, the transcript of the February 6 phone call shows that the call took place in the context of Pina-Nieves deciding how to prepare the Caguas Real house that he owned to be rented or sold by deciding what items he intended to store in a warehouse, what items he intended to give away, what items he intended to keep with the Caguas Real house, and what items he intended to keep for himself either at the Caguas Real house or his second house in Puerto Rico, where all parties agree that Pina-Nieves actually lived when in Puerto Rico. And, according to the transcript, Pina-Nieves not only first raised the issue of the "safe" and later told the other party to the call, Romero-Soler, what the "safe" contained but also left no doubt it contained guns and bullets that were his, as he described the "safe" as containing: "my guns, rifles, bullets" (emphasis added).

Moreover, and crucially, the transcript does not just show that Pina-Nieves understood the weapons and ammunition to which he referred to be his own. It also shows that when Romero-Soler suggested that Pina-Nieves "have Miguel take out anything he needs to take out," then "reset [the keypad on the hidden room's door]" and "leave [the door] open behind there so that whoever moves in there will use it," Pina-Nieves responded emphatically in the negative. Because prohibiting action is as much an exercise of dominion and control as allowing action, the transcript therefore shows that Pina-Nieves claimed on February 6,

2020 that guns and ammunition that were located in a private area of the house that he owned were his own, that on that date an associate of his had sought out his direction about what to do with those guns and that ammunition, and that he had responded to that associate's request for that direction by giving it in no uncertain terms.

We thus do not see how the transcript may be read other than to show that Pina-Nieves had "some stake in" the firearms and ammunition he called "my" guns and bullets as of February 6, 2020, see Ridolfi, 768 F.3d at 62, a date that Pina-Nieves does not dispute is "on or about April 1, 2020." Accordingly, the government has met its burden to show harmless error because the overwhelming nature of the evidence of Pina-Nieves's constructive possession of weapons and ammunition "on or about April 1, 2020" makes it "highly probable" that the evidentiary errors did not affect the verdict of guilt on the § 922(g)(1) charge. See Piper, 298 F.3d at 56–58.[1]

---

[1] Pina-Nieves does argue that the exclusion of the Millman evidence deprived him under the U.S. Constitution of his Fifth and Sixth Amendment rights to mount a defense and that the admission of the "just the fact that" sentence from his motion to dismiss deprived him under the U.S. Constitution of his Sixth Amendment right to conflict-free counsel. But, we need not address those challenges in any detail because each fails for the same reasons that we conclude that the Rule 801 and Rule 401 errors are harmless: the evidence of guilt concerning the only disputed element of this conviction is overwhelming. See United States v. Cardona-Vicenty, 842 F.3d 766, 772 (1st Cir. 2016); United States v. Pizarro, 772 F.3d 284, 287 (1st Cir. 2014).

- 33 -

**IV.**

Pina-Nieves's § 922(g)(1) conviction is **<u>affirmed</u>**, while his § 922(o) conviction is **<u>reversed</u>**.